SHIVERS *v.* THE STATE.

No. 10653. NOVEMBER 13, 1935. REHEARING DENIED JANUARY 18, 1936.

*Randall Evans Jr.* and *Jack D. Evans,* for plaintiff in error.

*M. J. Yeomans, attorney-general, J. Cecil Davis, solicitor-general, B. D. Murphy, J. T. Goree* and *E. J. Clower,* contra.

RUSSELL, Chief Justice. Lloyd Shivers was convicted of the offense of rape, and was given a sentence of two to four years in the penitentiary. His motion for new trial was overruled, and he excepted.

The prosecutrix testified: "My name is Inez Cranford. I was seventeen years old on the 21st of December, 1933. I know Lloyd Shivers. I saw him on the 25th day of December, 1933. When I first saw him I was at Mr. Deal Shelton's, near Cadley. I went up there the night before. I went up there with a girl friend of mine, Bessie Shelton. I went up there to spend the night with her. I was to come back with Mr. and Mrs. Ray Simonds. They came up there the next morning with Lloyd Shivers. They came up there in Mr. Shivers' car. I did not know how they were going to come back when they came up there. I went back in that automobile with them. As to whether I asked them to let me go back in it, Bessie Shelton asked for me. Bessie was the girl I was with. I came back in the automobile. We first went to Mr. Simonds' home. I got out there, intending to spend the night. I had no way to go home. They never did ask me to spend the night; and Lloyd asked me to go home with him, and I started home in the automobile with him. It was about 7 o'clock, it was dark. Mr. Shivers' home, round the road, was about two miles from my home; around the path it was not a half mile. The way I went it was about two miles. I did not go all the way without stopping. I went about half a mile before I stopped. He stopped the car in a hollow next to the creek, in a swampy place. As he was stopping the car he says, '. . Damn this thing;' and I say, 'What is the matter?' and he says, 'The . . damn thing ain't getting any gas.' He went round the car and came back, and I thought he was going to fix the car, and he came back and caught around my waist and nearly snatched me out, and he says, 'Come

on, get on the ground,' and he bruised my right hand, and he couldn't get me out, so he had intercourse, with me against my will. I couldn't help myself. That was in Warren County. Then he took me home. When I got to the house I got out and went in, and in about five minutes he came in the house. I did not say anything to him then, and he did not say anything to me. I did not say anything to my mother, because I knew they did not want me with Lloyd Shivers. I knew I was in trouble, and I decided to keep it to myself. I finally told my mother, because it got to grieving me so I told it. I got to where I could not eat and sleep."

Her mother testified that when the prosecutrix returned home with Lloyd Shivers on the night in question she "looked pale, like she was sick or frightened, or maybe both. . . I did not take particular notice of her clothes. Lloyd Shivers came in later . . after Irene had come in, . . and got a drink of water and talked to my daughter-in-law a few minutes . . Irene took off her coat and hat, and . . I seen blood on her dress. I says, 'Irene, I hope you have not been in company in that shape.' . . I says, 'Irene, are you sick?' and she says, 'Yes, Mama, I never eat much for dinner to-day.' She went down hill gradually. . . I could hear her at night mumbling and turning over in her sleep, and I told my husband, 'If Irene doesn't get better we will have to take her to the doctor.' On the 29th day of January I was milking, and I came in the house, and Irene fell down on the bed, and I says, 'What in the world is the matter?' She told she was grieving over the way Lloyd Shivers treated her on the night he brought her home." On cross-examination the mother testified that she had never warned the prosecutrix about going with Lloyd Shivers; that she "did not think Lloyd Shivers was that low down at that time."

A physician who examined the prosecutrix after she made complaint the latter part of January, 1934, testified: "I found some bruises on her. I have forgotten the exact location. I think they were on one or both legs and thighs. I made a local examination to see if she had been entered by something. There was no blood or anything like that. It was stretched. The hymen was broken. Those bruises were not fresh. I could not say how old they were, but they were several days old. A bruise will vary; it depends on

how badly bruised and the physical condition of the person bruised. They had turned yellow. They could have been there as much as thirty days. I don't recall exactly how many bruises I found on her body. I found them on both legs, hips and thighs. I found that she had been entered by something. . . I don't know what made the bruises. . . It could have been caused by pressure; pressure will make practically the same kind of bruise as a blow. . . It is possible that a leg bruise against another would cause a bruise that would show thirty days later. I don't think a person could have their legs pressed together so as to cause a bruise like that." It appeared from testimony of the prosecutrix that the defendant came to her home once when her parents were present, between the time of the alleged assault and the time a warrant was sworn out for his arrest, and that between these times she went to the box where the letter carrier left mail, and found the defendant and his mother there; and that the prosecutrix engaged in conversation with the defendant's mother, and they brought her home in their automobile. The defendant introduced no evidence. He made a statement admitting having intercourse with the prosecutrix, but claiming it was with her consent.

Special ground 1 of the motion for new trial asserts that there was not sufficient evidence to authorize the verdict, that the testimony of the prosecutrix was not sufficiently corroborated, and that there was no other evidence sufficient to authorize a conviction. Ground 2 assigns error on the following instruction: ".Before you would be authorized to convict the defendant on circumstantial evidence alone, the proved facts must not only be consistent with the hypothesis of guilt, but must exclude every other reasonable hypothesis save that of the guilt of the accused." The errors assigned are that this charge instructed the jury that the defendant could be convicted of rape on circumstances alone, and amounted to an expression of opinion by the court that there was sufficient circumstantial evidence upon which to base a conviction. Ground 3 alleges that the court did not charge the jury on the question of corroborating the prosecutrix's testimony; that it was necessary that her testimony be corroborated by other testimony or circumstances, before there could be a conviction; and that the court did not charge the jury on the manner in which it was necessary to

corroborate her testimony. Ground 4 alleges that Anchors, a member of the jury, after the charge of the court had been delivered and before the jury's retirement for consideration of the case, "separated himself from the rest of the jury and went into the office of the solicitor-general who prosecuted the case, unattended by any bailiff, and was heard talking in said office; all of which was unknown to the defendant or his counsel until after the verdict had been rendered." On the hearing the State by way of countershowing introduced the affidavit of the juror, denying the facts set out in this ground of the motion and in the affidavit thereto attached. The other members of the jury also gave affidavits to the same effect, as did the bailiff who had the jury in charge. Ground 5 alleges that Wood, a member of the jury, was disqualified because of bias and prejudice against the defendant, and that on the day of the trial, before being drawn on the jury, he was heard to express a fixed opinion as to the guilt of the accused, and had made similar statements previously. On a counter-showing the State introduced the affidavit of Wood, in which he denied making the statements attributed to him, and swore that he had no prejudice or bias against the accused.

■ The evidence authorized the verdict.

■ There being both direct and circumstantial evidence in the case, it was proper for the court to define to the jury each class of evidence, and to explain the difference between them. *Joiner* v. *State,* 105 *Ga.* 646 (31 S. E. 556); *Phillips* v. *State,* 12 *Ga. App.* 563 (77 S. E. 832). The excerpt from the charge of the court of which complaint is made in special ground 2 of the motion for new trial followed immediately after the definition of circumstantial evidence, and could only serve to enlighten the jury as to the effect of such evidence. The charge complained of tended to minimize rather than to magnify the weight which the jury were instructed to give to circumstantial evidence. The court could not properly read out of the case the direct testimony, and this instruction did not purport to do so. It did not have the effect of telling the jury that if they found that the case depended on circumstantial evidence alone, they would still be authorized to convict the defendant, provided they believed that the circumstances were consistent with guilt and excluded every other reasonable hypothesis. If a defendant can not be convicted of rape solely on

circumstantial evidence, the charge might be considered inapplicable, but not as being harmful to the accused.

■ The assignment of error in special ground 3 is without merit, it appearing that the court fully charged the jury that the testimony of the prosecutrix must be corroborated in order to authorize a conviction, and that the jury were the judges as to whether her testimony was sufficiently corroborated.

■ No abuse of discretion appears in overruling, on conflicting evidence, ground 4, alleging that one of the jurors separated himself from the other members and from the bailiff in charge of the jury, and entered the office of the solicitor-general and was heard talking there. Nor is any abuse of discretion shown in overruling, on conflicting evidence, ground 5, based on the allegation that a named juror was not fair and impartial, but was prejudiced against the accused and had expressed an opinion that the accused was guilty.

The court did not err in overruling the motion for a new trial.

*Judgment affirmed. All the Justices concur.*